T.C. Memo. 2017-203

UNITED STATES TAX COURT

JEFFREY WYCOFF AND MERRIE PISANNO-WYCOFF, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24158-09.                              Filed October 16, 2017.

<u>Steven R. Toscher</u> and <u>Lacey E. Strachan</u>, for petitioners.

<u>Halvor R. Melom</u>, <u>Debra Ann Bowe</u>, and <u>Michael E. Washburn</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Chief Judge</u>:  Respondent determined deficiencies in petitioners'

Federal income tax and section 6662(a)[1] accuracy-related penalties as follows:

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code (Code), as amended and in effect for the years at issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure.  All monetary
(continued...)

| [*2]<br>Year | Deficiency | Penalty<br>sec. 6662(a) |
|------|------------|-------------|
| 2001 | $4,511,398 | $902,280 |
| 2002 | 518,138 | 103,628 |

After concessions,[2] the issues for decision are (1) whether two subchapter S corporations petitioners owned, Sirius Products, Inc. (Sirius), and Restore 4, Inc. (Restore 4),[3] are entitled to deduct management fees they paid to Albion Management, Inc. (Albion), in 2001-03[4] (years at issue), and (2) whether petitioners are liable for accuracy-related penalties pursuant to section 6662(a) for the 2001 and 2002 taxable years.

---

[1](...continued)
amounts have been rounded to the nearest dollar.

[2]Respondent concedes that petitioners did not receive a deemed distribution of their vested account balances in an employee stock ownership plan (ESOP) trust under sec. 409(p)(2) in 2002. Petitioners concede that they were not entitled to apply a net operating loss (NOL) generated in 2004 against their 2005 tax liability, and they agree that the NOL should be applied against petitioners' 2002 tax liability. All other issues are computational.

[3]We will refer to Sirius and Restore 4 collectively as the operating companies.

[4]Although respondent did not determine a deficiency in petitioners' 2003 Federal income tax, our determination of whether the operating companies are able to deduct management fees paid to Albion in 2003 will affect the amount of an NOL carryback that petitioners' claimed on their 2001 return.

[*3]                              FINDINGS OF FACT

Some of the facts have been stipulated.  The stipulations of facts are incorporated herein by this reference.  Petitioners resided in Colorado when they petitioned this Court.  The parties have stipulated that an appeal in this case would lie to the U.S. Court of Appeals for the Tenth Circuit.

I.    Background

Jeffrey Wycoff earned a bachelor of arts degree from Ryder College in 1975.  Mr. Wycoff previously had two California State licenses:  a B1 contractor's license and a C54 tile contractor sublicense.  In 1981 he sold life insurance.  At some point between 1981 and 1985 he managed a Domino's Pizza franchise.  From 1985 to 1991 he sold cars.  From 1991 to 1995 he managed the Better Bath of L.A. (later named Tile Pros), a construction company.

Merrie Pisanno-Wycoff earned her bachelor of arts degree in public relations from California State University, Chico, in 1980 and her doctor of philosophy degree in comparative religion from the University of Sedona.

II.   Zap

In the early 1990s petitioners asked a chemist, Dr. Marantz, to create a chemical formula for a product that would clean tile.  Dr. Marantz developed the formula, and petitioners named the product "Zap".  Petitioners filed a trademark

**[*4]** application for the name "Zap". They also attempted to patent the formula but were advised by legal counsel that it was too simple to patent. They subsequently decided to sell Zap using a direct response marketing model, specifically infomercials. They had previously used direct response marketing for other products, but the marketing for many of those products was not successful. In their experience, whether the consumer liked the product was the most important factor in determining success. They generally expected their products to at best have an 18-month life cycle.

III.   The Operating Companies

A.   Sirius

Petitioners incorporated Sirius on January 11, 1995. They initially capitalized Sirius with funds from Tile Pros and personal credit cards. They were the only members of Sirius' board of directors and its only officers.

Sirius formulated, manufactured, and marketed household chemical products. In particular, Sirius sold Zap directly to consumers using infomercials and to various retailers, including Wal-Mart, Costco, Bed Bath & Beyond, Linens 'N Things, Walgreens, Target, Kroger, BJ's, Sam's Club, and several grocery stores in Salt Lake City, Utah. Sirius also sold products that it developed, which were unrelated to Zap. Sirius used direct response marketing, specifically "short

[*5] form" television advertisements (approximately two minutes long), to market its products.

B.    Restore 4

Petitioners incorporated Restore 4 on January 30, 1997.  They initially capitalized Restore 4 with funds from Sirius.  Restore 4 sold the same products as Sirius.  They incorporated Restore 4 because Sirius could not market its products using the various direct response companies, such as the Home Shopping Network and QVC.  The operating companies operated out of the same facility, and they shared a common labor force.

Restore 4 sold Zap under the name "Restore 4" (Restore 4 product). Restore 4 owned the rights to the Restore 4 product name.  Restore 4 sold the Restore 4 product directly to consumers and through Home Depot.  Restore 4 marketed its products via "long form" television advertisements (approximately 30 minutes long) and on QVC.

C.    The Operating Companies' Operations

On January 1, 2001, Sirius and Restore 4 elected to be subchapter S corporations, and they were subchapter S corporations at all times during 2001-03. Petitioners were at all relevant times the sole officers and board members of the operating companies.  After the years at issue Restore 4 merged with Sirius.

**[\*6]** Mr. Wycoff was primarily responsible for all operations of the operating companies. His principal duties included: negotiating contracts, overseeing advertising purchases and content, managing the operating companies' finances, selling the products to retailers, and overseeing other employees' work. In short, Mr. Wycoff performed all managerial tasks for the operating companies. He also referred to himself as the national sales manager and product spokesman because of his duties in selling the products and overseeing advertisements.

IV.    The Marshall & Stevens Transaction

On August 18, 2000, Robert Boespflug of Marshall & Stevens ESOP[5] Capital Strategies Group (Marshall & Stevens) gave a presentation to Barry Marlin, petitioners' attorney at the time. The presentation outlined how the operating companies and petitioners could purportedly reduce their income tax liabilities by way of a series of transactions (collectively, Marshall & Stevens transaction) using a subchapter S corporation, a deferred compensation plan, and an ESOP. Petitioners did not attend this presentation. During the presentation Mr. Boespflug's PowerPoint slides represented that the objectives of the Marshall & Stevens transaction were to: (1) "reduce corporate income tax liability"; (2) "defer income/reduce personal income tax liability of owners"; (3) "get equity

---

[5]ESOP is an abbreviation for employee stock ownership plan.

[*7] ownership/special benefits in the hands of key people"; (4) "provide broad-based incentives to rank & file"; and (5) "create tax advantaged structure in preparation of future asset sale".  Marshall & Stevens' PowerPoint slides also represented that the proposed steps of the transaction were as follows:

Step One:  Form a new subchapter S Corporation (SMC);

Step Two:  Create deferred compensation benefits for key employees of operating entities;

Step Three:  Adopt ESOP/401(k) plan;

Step Four:  Sell new SMC stock to ESOP/401(k) for $1000 promissory note;

Step Five:  Pay management fee from each operating entity to SMC. Adopt mgt. contracts;

Step Six:  Manage the new assets in the SMC, fund the deferred compensation benefits and ESOP/401(k) Plans.

**[*8]**    After the presentation Mr. Marlin and Roland Attenborough,[6] an attorney

with Reish & Luftman hired by Marshall & Stevens to develop the portion of the

Marshall & Stevens transaction with respect to the ESOP, met with Mr. Wycoff to

discuss the transaction.  After the meeting Mr. Wycoff instructed Mr. Marlin to

review the transaction.  Mr. Marlin's review consisted solely of discussions with

two accounting firms.  Mr. Marlin did not provide petitioners with a written legal

opinion.  On the basis of Mr. Marlin's limited review petitioners decided to

implement the transaction, and on August 28, 2000, petitioners, on behalf of

Sirius, executed a contract with Marshall & Stevens to implement the Marshall &

---

[6]Trial was held in this case on August 13 and 14, 2012.  During the course of posttrial proceedings the Court became aware of a potential conflict of interest involving petitioners' then counsel, Jeffrey D. Davine, an attorney associated with Mitchell Silberberg & Knupp, LLP.  At the time of trial Mr. Attenborough was and had been, since before the filing of the petition, an attorney also associated with Mitchell Silberberg & Knupp, LLP.  After discussing the matter with the parties the Court gave petitioners' counsel time to resolve the potential conflict of interest by obtaining the informed consent of petitioners to counsel's continuing representation.  After consultation with independent counsel petitioners advised their counsel and the Court that they would not provide the requested waiver. Consequently, petitioners' former counsel withdrew his representation and new counsel entered an appearance for petitioners.  In an order dated January 4, 2014, we concluded that petitioners' former counsel had an imputed conflict of interest, and we reopened the record for petitioners to, inter alia, present evidence as to the reasonableness under sec. 162 of the management fee and the arm's-length value of the management services that Albion purportedly provided to the operating companies.

[*9] Stevens transaction for a fee of $50,000. The contract contained the following disclaimer:

> The parties acknowledge that the S Management corporation and KSOP strategy is an aggressive tax planning program and that the CLIENT has been advised of this fact, has been advised to and has had the opportunity to seek independent legal and tax counsel with respect thereto, and does hereby accept the risk that the IRS may challenge and/or disqualify any aspect of the program * * * .[7]

## V. Implemention of the Marshall & Stevens Transaction

### A. Step 1: Albion Management

On October 19, 2000, Mr. Attenborough incorporated Albion Management, Inc. (Albion), and appointed petitioners as Albion's directors. Albion then designated Mr. Wycoff as its president, Dr. Pisanno-Wycoff as its secretary, and Janie Emaus as its chief financial officer. Petitioners have held their positions with Albion ever since. Albion then issued 10,000 shares of stock and sold 2,500 of those shares to Mr. Wycoff for $250 and 7,500 of those shares to Dr. Pisanno-Wycoff for $750. Albion also elected to be taxed as a subchapter S corporation.

### B. Step 2: Deferred Compensation Benefits

On November 1, 2000, Albion hired Mr. Marlin as its in-house counsel and Mr. Wycoff as a full-time manager for Albion's clients. Mr. Wycoff's contract

---

[7]An ESOP that is combined with a sec. 401(k) plan is referred to as a KSOP.

**[*10]** with Albion provided that Albion would compensate him with an annual salary, a deferred compensation plan, a life insurance policy, and an option to purchase 100 shares of Albion's stock at any time.

On November 1, 2000, Albion also established a "Supplemental Retirement Plan and Rabbi Trust" (Rabbi Trust).[8] The Rabbi Trust was an unfunded deferred compensation plan for the sole benefit of Mr. Wycoff. Mr. Wycoff is, and always was, the sole beneficiary of the Rabbi Trust. Mr. Marlin was appointed as the trustee of the Rabbi Trust. The Rabbi Trust agreement specified that it was effective from November 1, 2000, either until Mr. Wycoff left the company or until petitioners lost control of the company.

Under the Rabbi Trust agreement and Mr. Wycoff's employment contract all contributions to the Rabbi Trust were at Albion's discretion and were to be capped at 80% of Albion's management fees. The Rabbi Trust agreement forbade the assignment, alienation, pledge, or encumbrance of funds in the Rabbi Trust.

---

[8]A rabbi trust is an unfunded deferred compensation plan. Funds deposited into the trust remain subject to the claims of the employer's creditors. See In re IT Group, Inc., 448 F.3d 661, 664-665 (3d Cir. 2006). The employee beneficiary of the rabbi trust is not taxed on the funds deposited into the account until the funds are actually distributed to him. See id. Likewise, the employer is not entitled to a deduction for the funds deposited into the rabbi trust until the rabbi trust actually distributes the contributions. See id. at 665. Because Albion was an ESOP, a tax-exempt entity, it had no need for a current deduction because its income was tax-exempt. See secs. 401(a), 501(a).

[*11] The Rabbi Trust agreement provided that distribution of benefits was to occur upon Mr. Wycoff's separation from service.

### C.   Step 3:  KSOP and ESOP Trust

On November 8, 2000, Albion established a combined employee stock ownership and section 401(k) plan (KSOP) and an employee stock ownership plan trust (ESOP trust).  Albion appointed petitioners as trustees of the KSOP and the ESOP trust.  The operating companies then agreed to participate in the KSOP and the ESOP trust.  Petitioners did not participate in the KSOP or the ESOP trust.

### D.   Step 4:  Sell Albion to the ESOP Trust

On November 8, 2000, Albion contributed $1,000 to the ESOP trust. Petitioners then sold all 10,000 shares of Albion's stock to the ESOP trust for $1,000.  On December 19, 2000, Marshall & Stevens determined that the book value of Albion as of November 1, 2000, was $1,000.

### E.   Step 5:  Adopt Management Contracts

On October 30, 2000, the operating companies entered into management agreements with Albion.[9]  The agreements did not specify the particular services

---

[9]Albion entered into two other management agreements with Soapworks and Safety Tubs, two companies that petitioners incorporated in 2003.  However, because respondent does not challenge the management fees that Soapworks and Safety Tubs paid to Albion, we do not discuss them.

[*12] that Albion employees would provide. Under these agreements the operating companies agreed to purchase management services from Albion for 20% of their respective gross receipts.

To determine the management fee, Mr. Marlin, Mr. Attenborough, Mr. Boespflug, and Mr. Wycoff held a meeting where Mr. Wycoff described the services that Albion would provide to the operating companies. Petitioners did not hire an adviser familiar with petitioners' business model to assist with determining the amount of the management fee or to advise with respect to reasonable compensation. Mr. Marlin, Mr. Attenborough, Mr. Boespflug, and Mr. Wycoff had no experience determining reasonable compensation. On the basis of Mr. Wycoff's information, however, Mr. Marlin, Mr. Attenborough, and Mr. Boespflug calculated that an appropriate management fee was 20% of the operating companies' gross receipts.[10]

On November 1, 2000, Albion hired Mr. Wycoff to "provide management services to the client companies of * * * [Albion] so as to fulfill the obligations of

---

[10]Mr. Attenborough testified that the management fee was supported by caselaw because courts had upheld similar management fees. Petitioners did not introduce documentary evidence to show exactly how the management fee was calculated, and the record does not reveal the cases Mr. Attenborough allegedly reviewed or relied on. According to Mr. Wycoff the management fees were calculated partially on the basis of the profitability of the operating companies and not on the hours worked or services Albion provided.

**[*13]** * * * [Albion] under its various management agreements". The contract between Albion and Mr. Wycoff did not specify the particular "management services" that Mr. Wycoff was to provide. However, Mr. Wycoff provided the same services to the operating companies that he had provided to them before incorporating Albion.

The operating companies' functions did not change after they had hired Albion except that the employees of the operating companies began providing services via Albion. Employees were not aware of this change until they began receiving their salaries from Albion. For all practical purposes, the operating companies' employees' work did not change when they began working for Albion.

On January 1, 2002, the operating companies and Albion amended their respective management agreements to provide that the operating companies would pay Albion 10% of their respective gross receipts for Albion's services because the operating companies' revenues had declined. On September 1, 2003, the operating companies and Albion further amended their respective management agreements to provide that the operating companies would pay Albion 3% of their respective gross receipts for Albion's services. Regardless of the size of the fee, Albion purportedly provided the same services to the operating companies for the years at issue.

[*14] On their applicable Federal income tax returns the operating companies reported the following gross receipts, total income or loss, management fees, and ordinary or taxable income or loss:

Sirius

| Year | Gross receipts | Total income | Management fees | Income or loss |
|------|---------------|--------------|-----------------|----------------|
| 1998 | $7,004,350 | $4,944,211 | --- | ($42,608) |
| 1999 | 8,068,096 | 2,227,397 | --- | -0- |
| 2000 | 23,268,263 | 16,164,535 | $1,094,393 | 60,029 |
| 2001 | 46,475,388 | 30,974,978 | 8,413,486 | 1,491,607 |
| 2002 | 18,648,288 | 7,831,765 | 1,236,198 | (482,847) |
| 2003 | 4,336,682 | 1,535,736 | 328,075 | (298,568) |

Restore 4

| Year | Gross receipts | Total income | Management fees | Income or loss |
|------|---------------|--------------|-----------------|----------------|
| 1998 | $360,660 | $234,107 | --- | $25,398 |
| 1999 | 6,898,330 | 5,608,958 | --- | 48,965 |
| 2000 | 19,038,397 | 16,022,402 | $762,925 | 426,274 |
| 2001 | 12,858,998 | 10,540,527 | 2,536,815 | (455) |
| 2002 | 9,522,677 | 6,619,430 | 322,449 | 139,054 |
| 2003 | 5,453,891 | 3,642,867 | 332,531 | (108,230) |

[*15] F.    Step 6:  Fund Deferred Compensation

Albion's financial statements for financial year ending (FYE) December 31, 2001, FYE December 31, 2002, nine months ending September 30, 2003, and three months ending (3ME) December 31, 2003, show the following Rabbi Trust assets, accrued deferred compensation liability, and deferred compensation expense:

| FYE | Rabbi Trust assets | Accrued deferred compensation liability | Deferred compensation expense |
|---|---|---|---|
| Dec. 31, 2001 | Not separately stated | $11,045,932 | $8,760,242 |
| Dec. 31, 2002 | $4,651,269 | 11,500,262 | 774,954 |
| Sept. 30, 2003 | 9,317,751 | 11,381,215 | 548,740 |
| Dec. 31, 2003 | [1]10,739,301 | [2]12,136,356 | 87,355 |

[1]This amount was listed on Albion's balance sheet as follows:

| | |
|---|---|
| Rabbi Trust | $1,032,883 |
| UBS-Rabbi Trust (f.k.a.) Paine Web) | 9,706,418 |

[2]Albion accrued deferred compensation liability in its short, 3ME Dec. 31, 2003, year even though its employment agreement with Mr. Wycoff, as amended on Mar. 5, 2004, stated that such accruals would cease on Sept. 1, 2003.

The Rabbi Trust's ledger does not reflect any contributions by Albion to the Rabbi Trust.  Instead, the Rabbi Trust's ledger reflects a series of contributions from the operating companies on September 29, 2003.

[*16] On its Forms 1120S, U.S. Income Tax Return for an S Corporation, for 2001-03 and on the attached Schedules L, Balance Sheets per Books, Albion reported the following gross receipts, investments in the Rabbi Trust, total assets, and total liabilities and shareholders' equity:

| TYE | Gross receipts | Assets invested in Rabbi Trust | Total assets | Total liabilities and shareholders' equity |
|---|---|---|---|---|
| Dec. 31, 2001 | $10,283,449 | $10,787,657 | $10,891,076 | $10,891,076 |
| Dec. 31, 2002 | 1,803,671 | 11,294,169 | 12,073,165 | 12,073,165 |
| Sept. 30, 2003 | 685,925 | (¹) | 12,140,641 | 12,140,641 |
| Dec. 31, 2003 | 109,193 | (¹) | 12,801,680 | 12,801,680 |

[1]For its taxable years ending Sept. 30 and Dec. 31, 2003, Albion did not separately report its investments in the Rabbi Trust.

VI.     Windup of the Marshall & Stevens Transaction

On September 29, 2003, Albion revoked its subchapter S election and terminated the ESOP portion of the KSOP plan. On January 23, 2004, Marshall & Stevens determined that the book value of Albion as of September 30, 2003, was $112,390. On March 5, 2004, Albion and Mr. Wycoff amended Mr. Wycoff's employment agreement with Albion. Mr. Wycoff agreed to provide the same services as before, in exchange for a $60,000 annual salary, the accrued benefits in the Rabbi Trust, and a commitment that Albion would amend the Rabbi Trust agreement to provide that the Rabbi Trust would begin distributing its assets

[*17] quarterly.  Albion amended the Rabbi Trust agreement to provide that the Rabbi Trust would begin distributing its assets at Mr. Wycoff's discretion.

On April 12, 2004, the ESOP trust sold all of its Albion stock to Sirius for $112,390.  On March 25, 2005, Marshall & Stevens determined that the book value of Albion as of April 12, 2004, was zero.  In its March 25, 2005, appraisal, Marshall & Stevens opined that Albion's stock was worthless as of April 12, 2004, because Albion's total liabilities (most of the liabilities consisted of accrued deferred compensation) exceeded the value of its assets.  On March 29, 2005, Albion distributed $105,163.16 to various employees as a final distribution from the ESOP.

VII.  Wages Paid to Mr. Wycoff and Other Employees

From 1998 to 2000 the operating companies issued Mr. Wycoff Forms W-2, Wage and Tax Statement, showing the following wages:

| [*18] Year | Sirius | Restore 4 |
|------------|-----------|-----------|
| 1998 | $355,000 | -0- |
| 1999 | 320,000 | $137,500 |
| 2000 | 620,000 | [1]500,000 |

[1]Restore 4 issued Mr. Wycoff a Form W-2 stating that his wages were $500,000. However, Restore 4 reported on its Form 1120S for 2000 that Mr. Wycoff's wages were $642,500. Mr. Wycoff reported his wage income from Restore 4 as $142,500 on petitioners' Federal income tax return for 2000. Consequently, we use the Form W-2 amount.

From 2000 to 2003 Mr. Wycoff's total compensation from Albion was as follows:

| Year | Wages | Deferred compensation expense[1] | Total |
|------|----------|-----------|-----------|
| 2000 | $53,125 | -0- | $53,125 |
| 2001 | 744,983 | $8,760,242 | 9,505,225 |
| 2002 | 479,500 | 744,954 | 1,224,454 |
| 2003 | 51,000 | 636,095 | 687,095 |

[1]Petitioners' records vary as to the exact deferred compensation expenses. The Court uses the figures reported on Albion's financial statements as deferred compensation expenses.

[*19] From 2001 to 2003 Albion reported[11] the following wage expenses for its

employees:[12]

| Year | Wages Albion paid, excluding wages paid to Mr. Wycoff | Wages Albion paid to Mr. Wycoff | Payroll taxes | Total wage expenses |
|---|---|---|---|---|
| 2001 | $143,866 | $744,983 | $29,870 | $918,719 |
| 2002 | 353,205 | 479,500 | Not separately stated | 832,705 |
| 2003 | 419,792 | 51,000 | 38,745 | 509,537 |

Chet Millard was the most highly paid employee of the operating companies

from 2001 to 2003 other than petitioners. Mr. Millard was paid total wages of

$169,280, $141,779, and $78,762 by Albion and the operating companies for

2001, 2002, and 2003, respectively.

VIII. Potential Sale of Operating Companies

In 2001 petitioners hired Barrington & Associates, an investment banking

firm, to solicit offers to buy the stock or assets of the operating companies. In

drafting a memorandum for potential buyers, Barrington & Associates reviewed

the operating companies' financial performance. To calculate the profitability of

---

[11]Some of the amounts reported on Forms W-2 issued to employees are different from the wage expenses Albion deducted on its tax returns. For consistency, we rely on the amounts on the Forms W-2.

[12]The operating companies also paid wages, exclusive of wages paid to Mr. Wycoff, of $574,905, $450,218, and $97,363 for the years at issue, respectively.

[*20] the operating companies, Barrington & Associates excluded the management fees paid to Albion because the management fees exceeded market rate salaries. Barrington & Associates estimated that a market rate salary for all shareholder compensation was $300,000 per year.

IX.  Expert Witnesses

A.  Respondent's Expert

Respondent submitted the expert report of Kenneth Nunes, a chartered financial analyst. Mr. Nunes earned a master of science degree in mechanical engineering from the University of California, Davis, in 1981, and he earned a master's in business administration from the University of California, Los Angeles, in 1985. He has over 25 years of experience advising companies on financial, valuation, and dispute resolution issues. Since 1990 Mr. Nunes has testified as a valuation expert in various Federal and State courts.

Mr. Nunes's report addressed two issues: (1) whether Mr. Wycoff's compensation from Albion was reasonable and (2) whether the management fees that Sirius, Restore 4, Safety Tubs, and Soapworks paid to Albion were arm's-length fees within the meaning of section 482.

[*21]      1.      Mr. Wycoff's Compensation

Mr. Nunes examined the condition of the operating companies, the market for executive compensation in the industry and in the business community generally, and Mr. Wycoff's relevant qualifications and attributes.

Mr. Nunes found that compensation is typically determined by industry, firm size measured either by company value or revenue, and position. He determined that Mr. Wycoff was acting as the chief executive officer (CEO) of the operating companies. Therefore, to calculate the reasonable total value of compensation for Mr. Wycoff, Mr. Nunes examined compensation paid to individuals acting as the CEO of comparable companies.

Petitioners had identified the operating companies' primary business activity as the production and sale of household chemicals. Therefore Mr. Nunes determined that the operating companies' peer group was companies that had reported financial information from 1999-2003 in the following Standard Industrial Classification (SIC) codes: 2841 (soap, detergents, cleaning preparations, perfumes, cosmetics); 2842 (speciality cleaning, polishing and sanitation preparations), and 2844 (perfumes, cosmetics, and other toilet preparations). After reviewing the financial data of the peer group companies he excluded companies with less than $5 million and more than $200 million in

[*22] annual revenue because the total revenue of the operating companies ranged between $10 million and $60 million. Mr. Nunes included companies with annual revenue of $60 million to $200 million because doing so increased the number of companies to which he could compare the operating companies and the additional information helped him determine the upper limits of reasonable compensation. He excluded companies that conducted unrelated activities such as software companies and pharmaceutical drug companies. He ultimately identified seven companies that he concluded were comparable to the operating companies (peer group).

Mr. Nunes then compared the data for the peer group with data from a broader group of 24 different companies to ensure that the peer group did not set executive compensation at unreasonably low levels. All 24 companies had annual revenue below $200 million and were not pharmaceutical companies. In comparing executive compensation between the peer group and the broader group of 24 companies, Mr. Nunes used only cash compensation. He did not include stock option compensation because he determined that stock option compensation was not used in the industry and was "a meaningful source of CEO compensation only at larger companies." Mr. Nunes found that the peer group did not omit highly compensated individuals but rather included some of the most highly

[*23] compensated executives of the broader group of 24 companies. He therefore concluded that the peer group represented compensation in the industry.

Mr. Nunes then performed a regression analysis on the peer group data to create an equation for the relationship between annual CEO compensation and a company's annual revenue. The equation allowed him to input a particular annual revenue and determine what a company would pay its CEO. He calculated that companies of similar size in terms of annual revenue and in the operating companies' industry would have paid a CEO baseline compensation of $929,000 in 2001 and $606,000 in 2002.

In 2003 the operating companies' revenues were lower than those of the peer group, and therefore Mr. Nunes decided that using the equation for 2003 was not appropriate. Instead he calculated that the operating companies would pay a CEO baseline compensation of $109,000, which was the lowest salary a CEO in the peer group received for 2003.[13]

After calculating baseline compensation, Mr. Nunes considered whether baseline compensation should be increased to account for unique characteristics of

---

[13]The company that had the lowest CEO salary for 2003 also had the lowest revenue of the peer group. The operating companies had revenue of less than $10 million in 2003. In 2003 the company with the lowest revenue had revenue of approximately $20 million.

[*24] the operating companies and Mr. Wycoff. Mr. Nunes decided that a 20% cost of living adjustment was appropriate because of the location of the operating companies. He then determined that a 10% decrease in baseline salary for 2002 and 2003 was appropriate[14] because of revenue declines and a 20% increase in 2001 was appropriate because the operating companies had performed well.[15] He found that Mr. Wycoff's tenure, experience, and education were typical of other CEOs in the peer group and no adjustment for individual characteristics was necessary. Mr. Nunes therefore concluded that the reasonable total compensation for Mr. Wycoff's services was $1,338,000, $654,000, and $118,000 for 2001, 2002, and 2003, respectively.

### 2. Arm's-Length Management Fee

Mr. Nunes next determined what an arm's-length management fee would be for the years at issue. He reached his arm's-length calculation by first determining whether the services Albion provided the operating companies were nonintegral or

---

[14]Petitioners have cited the events of September 11, 2001, as a reason for the decline in sales during 2002 and 2003. Mr. Nunes' report concludes that the economy was relatively stable for the years at issue with the exception of a brief shock after September 11, 2001.

[15]Mr. Nunes cites academic literature indicating that executive compensation is positively correlated with relative profitability and changes in share value.

[*25] integral services for the purposes of the applicable regulations. See sec. 1.482-2(b)(3), (b)(7)(ii), Income Tax Regs. Mr. Nunes determined that Albion's services were integral, and the applicable regulations required that operating companies pay a management fee that unrelated parties would pay for similar services. See sec. 1.482-2(b)(3), Income Tax Regs.[16]

To determine an arm's-length charge for Albion's services, Mr. Nunes researched companies comparable to Albion. He used companies that had annual revenue between $5 million and $500 million and reported themselves as "employment agencies", "help supply services", and "all other professional services". He determined that these companies were similar to Albion because Albion provided routine management services to the operating companies.[17] Mr. Nunes then excluded companies that did not have a retail focus, which led to the exclusion of healthcare and IT services companies. He therefore determined that eight public companies engaged in management and administrative services with financial information reported during the years at issue were comparable to Albion.

---

[16]Mr. Nunes' report states that for nonintegral services an arm's-length price is deemed equal to all costs incurred. See sec. 1.482-2(b)(3), Income Tax Regs.

[17]Albion reported itself under "all other professional services".

[*26] Mr. Nunes used a cost markup method to determine the arm's-length management fee. His approach required him to determine the operating profit earned by comparable companies as a percentage of their total costs.[18] Mr. Nunes chose this method because Albion's costs were "readily observable and services provided are of a routine nature." After analyzing the costs of the eight public companies similar to Albion, he determined that the median cost markup was 4.6%, -0.5%, and -0.4%, respectively, for the years at issue.[19]

Mr. Nunes then calculated Albion's total expenses for each of the years at issue by adding the amount of Mr. Wycoff's reasonable compensation that he had determined, see supra part IX.A.1., and Albion's other reported expenses. After applying the median cost markup of comparable companies to Albion's total expenses, he determined that Albion was entitled to aggregate management fees of

---

[18]The regulations refer to this method as the comparable profits method (CPM). See sec. 1.482-5, Income Tax Regs. Petitioners contend that Mr. Nunes used the "cost of services plus method" described in sec. 1.482-9(e), Income Tax Regs. However, we find that the record supports a finding that Mr. Nunes used the comparable profits method because Mr. Nunes compared Albion's operating profit to that of similar companies. See sec. 1.482-5, Income Tax Regs. The "cost of services plus method" compares profit markup of the uncontrolled transaction with the controlled transaction. See sec. 1.482-9(e)(1), Income Tax Regs.

[19]The median cost markup was negative for 2002 and 2003 because the comparable group of companies that Mr. Nunes used had losses during those years.

[*27] $1.725 million, $1.417 million, and $705,000, respectively, for the years at issue. Albion provided services during the years at issue to Sirius, Restore 4, Safety Tubs, and Soapworks. Because Albion did not maintain time logs for its services to each of the companies,[20] Mr. Nunes allocated the management fees on the basis of relative costs incurred by the entities and determined the following allocations:

| Company | 2001 | 2002 | 2003 |
|---------|------|------|------|
| Sirius | $1,346,000 | $939,000 | $266,000 |
| Restore 4 | 379,000 | 478,000 | 324,000 |
| Safety Tubs | --- | --- | 35,000 |
| Soapworks | --- | --- | 80,000 |
| Total | 1,725,000 | 1,417,000 | 705,000 |

Mr. Nunes next considered the combined results of the reasonable compensation and the arm's-length management fee analysis. After allowing for a deduction for an arm's-length management fee, he calculated that the operating companies had a three-year average operating income margin of 4.9%. Because the operating income margin was within the three-year average for the operating companies' peer group, he considered his results reasonable.

---

[20]Albion started providing services to Safety Tubs and Soapworks only in 2003. As Mr. Nunes noted in his report, emerging companies often require more management time. However, without logs of the services Albion provided, Mr. Nunes was unable to allocate the management fee on the basis of services provided to each company.

[*28] B.     Petitioners' Experts

1.     Mr. Dupler

Petitioners submitted the expert report of Timothy Dupler.  Mr. Dupler has experience working with companies using direct response marketing.  He does not have any experience, training, or education in financial analysis or with the valuation of management contracts or executive compensation.

Mr. Dupler determined that the 20% of gross receipts that Albion charged the operating companies as a management fee was reasonable and customary for a company using direct response marketing.  He based his opinion on his previous experience with companies using direct response marketing, and he did not cite any corroborating sources, documents, or authorities in his report.

2.     Mr. Burns

Petitioner also submitted the expert report of Francis X. Burns, who is an accredited senior appraiser in business valuation from the American Society of Appraisers and who is certified as accredited in business appraisal review by the Institute of Business Appraisers.  Mr. Burns graduated from Stanford University in 1982 and earned a master of management degree in finance and economics from Northwestern University in 1986.  He has over 25 years of experience as an economic consultant, including experience evaluating executive compensation in

**[\*29]** the valuation of businesses, in commercial damages litigation, and in determining the reasonableness of compensation under the Code.  Mr. Burns has testified previously as an expert witness for both the Government and taxpayers.

Mr. Burns first considered the management contract Albion entered into with the operating companies.  He noted that, on the basis of information available in October 2000 when the contract was signed, scaling management fees to sales was reasonable because all parties assumed some risk of the operating companies' success.  However, he did not find the fact that petitioners controlled the operating companies and Albion relevant when concluding that the contract was reasonable.

Mr. Burns next looked at the services Albion provided with a focus on the services Mr. Wycoff provided.  He noted that Mr. Wycoff served in a variety of roles for the operating companies, including:  (1) CEO, (2) chief financial officer, (3) chief operating officer, (4) national sales manager, and (5) spokesman for the operating companies.

To determine a reasonable management fee for the services Albion provided the operating companies, Mr. Burns used four methods.  First, he looked to companies he had determined were comparable to petitioners' operating companies.  His consideration of companies that classified themselves as cleaning product companies and direct response industry companies with revenues similar

[*30] to those of the operating companies resulted in one company. Because he found only one, he expanded the criteria to include companies that classified themselves as "Chemical and Allied Products" companies, which included pharmaceutical companies. The new criteria resulted in 17 companies that he considered sufficiently similar to the operating companies. Of the 17 companies, 16 were pharmaceutical companies. None of the companies manufactured cleaning products, and only two sold cleaning products. On the basis of the salaries paid to the CEOs of this group and Mr. Wycoff's other work for the operating companies, Mr. Burns determined that a management fee of 15.1% would be reasonable.

Mr. Burns' next method of calculating a reasonable management fee was to compare Albion's CEO compensation with that of consulting firms. He considered hourly rates of CEO compensation of six consulting firms and found that the average rate was $740 per hour. He then determined, on the basis of Mr. Wycoff's statements, that Mr. Wycoff worked 13.5 hours per day, and therefore determined that Mr. Wycoff was entitled to $3.5 million per year, or approximately 15.9% of expected net sales.

Mr. Burns' third method for determining the management fee was to review an executive compensation survey. He used survey data from companies in the

[*31] cleaning, polishing, and sanitary preparations field with annual revenue of $22.5 million.[21] After combing the "maximum reasonable [cash] compensation" from the survey and the median figures for equity based compensation, he determined that an appropriate management fee was 15.3% of revenue.

The final method Mr. Burns used to calculate the management fee was an independent investor test. Mr. Burns' independent investor test required him to calculate the median return on tangible net worth for companies purportedly operating in the same industry as the operating companies. Using data from a survey, he determined that the median return on tangible net worth for similar companies was 8.3% to 14.4% over the years 1996 to 2001. The independent investor test led him to conclude that the operating companies should pay a management fee of 14%.[22]

Mr. Burns concluded on the basis of his four methods that it would have been reasonable to pay Albion 15% to 16% of the operating companies' sales for the years at issue. He also noted that Mr. Wycoff should be entitled to additional

---

[21]The survey data is not from the years at issue. The oldest data available for cash compensation was 2004, and data for equity compensation was available starting in 2007.

[22]Mr. Burns' report also notes that on the basis of projections from Barrington Associates, a management fee between 17% and 20% would be acceptable for 2001 and 2002.

[*32] compensation for his roles as national sales manager and product spokesperson.

## X.    Notice of Deficiency

Respondent issued a notice of deficiency to petitioners on July 15, 2009. Respondent disallowed the following deductions for management fees that the operating companies reported paying to Albion:

| Company | 2001 | 2002 | 2003 |
|---------|------|------|------|
| Sirius | $8,413,486 | $1,214,003 | $35,069 |
| Restore 4 | 2,536,815 | 321,564 | 226,317 |

Petitioners timely petitioned this Court.

## OPINION

## I.    Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, if a taxpayer produces credible evidence[23] with respect to any factual

---

[23]"Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)."  Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).

[*33] issue relevant to ascertaining the taxpayer's liability for any tax imposed by subtitle A or B of the Code and satisfies the requirements of section 7491(a)(2), the burden of proof on any such issue shifts to the Commissioner. Sec. 7491(a)(1). Section 7491(a)(2) requires a taxpayer to demonstrate that he or she (1) complied with the requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the Secretary[24] for witnesses, information, documents, meetings, and interviews. See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

Petitioners contend that the notice of deficiency should no longer be presumed correct. Petitioners contend that the expert reports by Mr. Dupler and Mr. Burns are credible evidence or that respondent has through his own concessions and expert reports established that his determination in the notice of deficiency was erroneous because respondent's primary position entitles petitioners to deduct some management fees, while the notice of deficiency disallowed the deduction for all management fees.

_____

[24]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

**[\*34]** Petitioners rely on a series of cases from the U.S. Court of Appeals for the Ninth Circuit holding that the Commissioner's adoption of a litigation position that substantially deviates from the position in the notice of deficiency results in a forfeiture of any presumption of correctness in the notice and places the burden of proof as to factual matters on the Commissioner. See Estate of Mitchell v. Commissioner, 250 F.3d 696 (9th Cir. 2001), aff'g in part, vacating in part and remanding T.C. Memo. 1997-461; Estate of Simplot v. Commissioner, 249 F.3d 1191 (9th Cir. 2001), rev'g and remanding 112 T.C. 130 (1999); Morrissey v. Commissioner, 243 F.3d 1145 (9th Cir. 2001), rev'g and remanding Estate of Kaufman v. Commissioner, T.C. Memo. 1999-119. The parties have stipulated that appeal in this case would lie to the U.S. Court of Appeals for the Tenth Circuit, and therefore we are not bound by caselaw from the U.S. Court of Appeals for the Ninth Circuit. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

Even if we were to follow the precedent of the U.S. Court of Appeals for the Ninth Circuit, the notice of deficiency would not lose the presumption of correctness. Although in the notice of deficiency respondent disallowed petitioners' claimed deductions for management fees, on brief he allowed the deductions to the extent petitioners proved that Albion had paid wages or payroll

**[*35]** taxes. When the Commissioner concedes certain facts or issues, the notice of deficiency is still presumed correct. See U.S. Holding Co. v. Commissioner, 44 T.C. 323, 328 (1965). In any event, we reach our decision on the basis of the preponderance of the evidence. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).

## II.   Management Fee Deductions

### A.    The Parties' Positions

Respondent advances four arguments as to why petitioners' claimed deductions for management fees that the operating companies paid to Albion under the compensation agreement should be reduced. Respondent's primary argument is that the operating companies did not substantiate the management fees beyond the amounts that Albion reported paying for wages and for payroll taxes. Alternatively respondent contends petitioners are entitled to deduct only the portions of the management fees that are considered reasonable compensation. See sec. 162(a)(1). Respondent also argues that the management fees should be reallocated under section 482 or, to the extent the management fees constitute unreasonable compensation, the transaction should be recharacterized as distributions to petitioners. Petitioners contend that the inquiries under section

[*36] 162 and section 482 are substantially the same and that under either Code provision they are entitled to deduct the management fees.

On brief respondent concedes that Albion is not a sham entity and should not be disregarded.[25] Respondent asks us to determine Mr. Wycoff's reasonable compensation under section 162. However, the management fees that the operating companies paid to Albion are before the Court and not Mr. Wycoff's reasonable compensation. Because respondent concedes that Albion is not a sham entity, we will focus our analysis on section 482 and the proper arm's-length amounts of the management fees. Although a section 482 analysis may require us to determine Albion's costs, including Mr. Wycoff's reasonable compensation,[26] Albion is entitled to charge the operating companies an arm's-length price for its services that may be higher than the salaries Albion paid.[27]

---

[25]In the notice of deficiency respondent determined as an alternative position that Albion should be disregarded because it lacked a legitimate business purpose and had no economic substance.

[26]We also find that the record provides an adequate basis to determine Mr. Wycoff's reasonable compensation, and therefore we reject respondent's substantiation argument. See Cohan v. Commissioner, 39 F.2d 540, 542-544 (2d Cir. 1930).

[27]Additionally, the regulations under sec. 482 provide that an arm's-length charge shall not be deemed equal to costs or deductions with respect to integral services. See sec. 1.482-2(b)(7)(ii)(A), Income Tax Regs. Respondent concedes

(continued...)

[*37] B.     Section 482

"Section 482 was enacted to prevent tax evasion and ensure that taxpayers clearly reflect income relating to transactions between controlled entities." Veritas Software Corp. & Subs. v. Commissioner, 133 T.C. 297, 316 (2009).  This section gives the Commissioner broad authority to allocate gross income, deductions, credits, or allowances between two related corporations if the allocations are necessary either to prevent evasion of tax or to clearly reflect the income of the corporations.  See Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 163 (1994).

To determine true taxable income, the standard to be applied in every case is that of a taxpayer dealing at arm's-length with an uncontrolled taxpayer.  Sec. 1.482-1(b)(1), Income Tax Regs.  The arm's-length result of a controlled transaction must be determined under the method that, under the facts and circumstances, provides the most reliable measure of an arm's-length result.  Id. para. (c)(1).  In determining which of two or more available methods provides the most reliable measure of an arm's-length result, the two primary factors to take into account are the degree of comparability between the controlled taxpayer and

---

[27](...continued)
that the services Albion provided the operating companies were integral.

[*38] any uncontrolled comparable and the quality of data and assumptions used in the analysis.  See sec. 1.482-1(c)(2), Income Tax Regs.

The parties dispute the best method for determining an arm's-length result. Petitioners contend that we should accept Mr. Burns' analysis, which applies four different methods that all reach a result of 15% to 16% of the operating companies' revenues as a management fee.  Respondent contends that the CPM that Mr. Nunes applied is best method for reaching an arm's-length result because data of comparable transactions was unavailable and Mr. Nunes' determination ensured that Albion would receive the same profit or loss as companies providing similar services.  Accordingly, we must determine the most reliable method for calculating an arm's-length management fee.[28]  We do so by analyzing the expert reports.

### 1. Expert Reports

Both parties introduced expert witness reports and additional testimony to assist the Court in determining the management fee.  Expert witnesses are

---

[28]For sec. 482 to apply, the operating companies and Albion must be "owned or controlled directly or indirectly by the same interests".  See sec. 482. During the years at issue petitioners owned and controlled the operating companies.  Petitioners served as directors of Albion and as trustees of the KSOP plan and the ESOP trust.  Petitioners therefore controlled Albion.  Accordingly sec. 482 applies.

[*39] appropriate to help the Court understand an area requiring specialized training, knowledge, or judgment. See Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989). Nonetheless, the Court is not bound by an expert's opinion, and we may either accept or reject expert testimony in the exercise of sound judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, 86 T.C. 547, 561-562 (1986). Furthermore, the Court may be selective in determining what portions of an expert's opinion, if any, to accept. Parker v. Commissioner, 86 T.C. at 562.

### a. Petitioners' Experts

Petitioners first submitted the expert report of Mr. Dupler. Mr. Dupler has previously worked with companies that use direct response marketing, and, on the basis of that experience he concluded that a management fee of 20% was reasonable for Albion to charge. Mr. Dupler did not provide any support for his opinion other than his experience, and he did not cite any academic literature or trade publications. He cited fee arrangements by a company that he had worked for as support for his conclusion, but he did not have access to the fee arrangement contracts. Additionally, the contracts were not from the years at issue, and we are not convinced that these contracts represent current trends. Mr. Dupler also admitted that the contracts had been modified several times. Accordingly, we

**[*40]** decline to accept Mr. Dupler's conclusions in his expert report because they cannot be verified.  See sec. 1.482-1(c)(2), Income Tax Regs.

Petitioners also submitted the expert report of Mr. Burns.  Mr. Burns calculated that the "market-based compensation for management serviced provided by Mr. Wycoff through Albion would have been in the range of 15% to 16%".  Mr. Burns also found that Mr. Wycoff may be entitled to additional compensation for his role as national sales manager and products spokesman.  To support his conclusion, Mr. Burns used four different methods.

Mr. Burns' first method was to look at comparable companies and compare the salaries of the CEOs.  He selected 16 pharmaceutical companies as comparable corporations.  We disagree that pharmaceutical companies are comparable to the operating companies.  See id. subdiv. (i) (stating that as comparability increases, inaccuracy is reduced).  As Mr. Nunes stated in his rebuttal report, the development cost of a drug is substantially more than the cost of developing a household cleaner.  Most drugs also have a longer life span and are generally protected through a patent.  In contrast, the product at issue here, Zap, was not eligible for a patent.  Also, as petitioners conceded, most products that are marketed using direct response have an 18-month product life cycle.  Further, the development of drugs requires particular skills and expertise that were not

[*41] required for petitioners' business. There is no evidence to support the claim that pharmaceutical companies are comparable to the operating companies other than Mr. Burns' opinion, and we do not find that opinion to be credible. Mr. Burns did not select any company that manufactures cleaning products, and he included only two companies that distributed cleaning products as comparable to the operating companies. Accordingly, we find this method unreliable.

Mr. Burns' next method for determining the management fee was to calculate the fee as if Albion were a consulting firm. He considered the hourly rate of CEO compensation of six consulting firms, and after calculating the number of hours Mr. Wycoff worked, Mr. Burns determined that Albion was entitled to 15.9% of net sales for a management fee. However, Mr. Burns' report is devoid of any analysis of how these six consulting companies compare to Albion and the services it provided. Additionally, Mr. Wycoff did not maintain time logs of the work he performed and for which entity. Other than his testimony, which we find exaggerated and not credible, there is no evidence in the record to support Mr. Wycoff's hours.

Mr. Burns' third method for determining the management fee was to review an executive compensation survey. Although the survey includes companies that considered themselves cleaning, polishing, and sanitary preparations companies

[*42] with revenue of $22.5 million, Mr. Burns' report does not identify which companies he included.[29]  Mr. Burns' fourth method for calculating the management fee was an independent investor test, which included companies from the same company classification as the executive survey.  He determined that these companies earned a median return on tangible net worth ranged from 8.3% to 14.4%.  For the operating companies to earn a similar return, Mr. Burns' determined that a management fee of 14% was reasonable.

We find both Mr. Burns' executive survey compensation method and independent investor method unreliable.  Under both methods, Mr. Burns did not identify the companies he used for these tests.  We note that respondent's expert also used data from various company classifications and found that some of the companies in particular classifications were not comparable to the operating companies.  Petitioners have objected to the use of a company in this category that Mr. Nunes included in his report, yet petitioners' expert report does not state what companies were included in the survey or independent investor method.  In short, we decline to accept Mr. Burns' determination because the underlying data is not

---

[29]Additionally, in calculating an acceptable management fee under the survey method, Mr. Burns used the "maximum reasonable [cash] compensation" from the survey.  However, Mr. Burns' report is devoid of any analysis as to why Albion would be entitled to the maximum figure.

**[*43]** available, and we are unable to conclude that the companies on which Mr. Burns relied are comparable to the operating companies.

### b. Respondent's Expert

Respondent submitted the report of Mr. Nunes. Mr. Nunes determined that an appropriate method for calculating an arm's-length management fee was a markup of Albion's expenses, referred to as CPM. See sec. 1.482-5, Income Tax Regs. Mr. Nunes' method required that, after determining Albion's costs, Mr. Nunes multiply the costs by the median profit margin of a comparable group of companies for the particular year at issue.

Mr. Nunes looked to the cost markup of companies that provided management services to other companies. His research found eight public companies that were comparable to Albion. After analyzing the eight comparable companies, Mr. Nunes determined that the cost markups should be 4.6%, -0.5%, and -0.4% for the years at issue, respectively. He next determined Albion's costs by using Albion's reported expenses, subtracting that portion of the expenses Mr. Nunes considered to be unreasonable compensation to Mr. Wycoff.

Petitioners contend that Mr. Nunes' analysis is unreliable because the analysis relies on his determination that Mr. Wycoff was overcompensated. Because Mr. Nunes determined that Mr. Wycoff's compensation was unreasonable

**[*44]** for the years at issue, he adjusted Albion's reported expenses before conducting his cost markup analysis. Accordingly, we will address Mr. Nunes' reasonable compensation analysis.

Section 162(a)(1) allows a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as an ordinary and necessary business expense. A taxpayer is entitled to a deduction for compensation payments if the payments are reasonable in amount and in fact paid purely for services. Sec. 1.162-7(a), Income Tax Regs. The question of whether amounts paid to employees represent reasonable compensation for services rendered is a question of fact that must be determined in the light of all the evidence. Botany Worsted Mills v. United States, 278 U.S. 282, 289-290 (1929); Perlmutter v. Commissioner, 373 F.2d 45, 47 (10th Cir. 1967), aff'g 44 T.C. 382 (1965); Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), aff'd, 965 F.2d 1038 (11th Cir. 1992). Special scrutiny is given in situations where a corporation is controlled by the employees to whom the compensation is paid because there is a lack of arm's- length bargaining. Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176, 179 (10th Cir. 1975), aff'g 61 T.C. 564 (1974); K & K Veterinary Supply, Inc. v. Commissioner, T.C. Memo. 2013-84, at *10.

[*45] Section 1.162-7(b)(2), Income Tax Regs., provides that "the form or method of fixing compensation is not decisive as to deductibility." Contingent compensation agreements generally invite scrutiny as a possible distribution of earnings, but this Court has upheld such agreements under appropriate circumstances. See Auto. Inv. Dev., Inc. v. Commissioner, T.C. Memo. 1993-298. If a contingent compensation agreement generates payments greater than the amounts that would otherwise be reasonable, those payments are generally deductible only if: (1) they are paid pursuant to a free bargain between the employer and the individual; (2) the agreement is made before the services are rendered; and (3) the payments are not influenced by any consideration on the part of the employer other than that of securing the services of the individual on fair and advantageous terms. Sec. 1.162-7(b)(2), Income Tax Regs. Where there is no free bargain between the parties, the contingent compensation agreement is not dispositive as to what is deductible under section 162. Rather the Court is free to make its own determination of what is reasonable compensation. Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d at 181-183; Hammond Lead Prods., Inc. v. Commissioner, 425 F.2d 31, 33 (7th Cir. 1970), aff'g T.C. Memo. 1969-14.

The U.S. Court of Appeals for the Tenth Circuit, to which an appeal in this case would lie, applies nine factors to determine the reasonableness of

**[\*46]** compensation, with no factor being determinative: (1) the employee's qualifications; (2) the nature, extent and scope of the employee's work; (3) the size and complexities of the business; (4) a comparison of salaries paid with the gross income and net income; (5) the prevailing economic conditions; (6) a comparison of salaries with distributions to shareholders; (7) the prevailing rates of compensation for comparable positions in comparable concerns; (8) the salary policy of the taxpayer as to all employees; and (9) in the case of small corporations with a limited number of officers, the amount of compensation paid to the particular employee in previous years. Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d at 179.

We do not undertake an exhaustive review of each factor to determine that Mr. Wycoff's compensation was unreasonable. Mr. Wycoff had not previously worked in retail or with companies that use direct response marketing. In fact, Mr. Wycoff testified that he had to learn how direct response marketing worked, which is why Mr. Nunes determined that no increase to baseline compensation was warranted to account for Mr. Wycoff's characteristics.

The record also does not convince us that Mr. Wycoff's work was any more complex or extensive than that of a typical executive. Mr. Wycoff did work diligently for the operating companies and his other startups; however, he did not

**[*47]** maintain any records reflecting what he did and for which company.[30]

Petitioners also appear to argue that multiple salaries should be aggregated to account for Mr. Wycoff's multiple roles. This Court has consistently rejected that argument. See Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. at 569; Richlands Med. Ass'n v. Commissioner, T.C. Memo. 1990-660, aff'd without published opinion, 953 F.2d 639 (4th Cir. 1992); Ken Miller Supply, Inc. v. Commissioner, T.C. Memo. 1978-228.

Petitioners owned the operating companies. Shareholder executive compensation in a closely held corporation that depletes most of a corporation's value is generally unreasonable when the deductible salary expenses are a disguise for nondeductible profit distributions. See Eberl's Claim Serv. v. Commissioner, 249 F.3d 994, 1000 (10th Cir. 2001), aff'g T.C. Memo. 1999-211. In this case, the management fee depleted most, if not all, of the operating companies' profits. The management fee in turn was used primarily to pay Mr. Wycoff. For example, approximately 87% of the management fee went to pay Mr. Wycoff's compensation in 2001.

---

[30]Petitioners' expert Mr. Burns noted that Mr. Wycoff claimed to work 15 hours a day, seven days a week, and 52 weeks a year with no vacation. Mr. Wycoff did not maintain logs of his hours, and his testimony with respect to his hours was vague. We do not find Mr. Wycoff's testimony credible with respect to his hours.

**[\*48]** Our conclusion that Mr. Wycoff's compensation was unreasonable for each year at issue is bolstered by the fact that the investment bank that petitioners had hired to advise them with respect to the potential sale of the operating companies found that Mr. Wycoff was compensated in excess of market rates and his annual compensation should be approximately $300,000. Mr. Wycoff's compensation, including deferred compensation, was $9,505,225, $1,224,454, and $687,095 in 2001, 2002, and 2003, respectively. While Mr. Wycoff's duties remained constant from prior years to the years at issue, Mr. Wycoff received a substantial increase in compensation during the years at issue. Petitioners contend that a portion of Mr. Wycoff's compensation was compensation for work completed before the years at issue. See Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930) (holding that a taxpayer may deduct compensation paid in the current year but for services provided in prior years). However, the record is completely devoid of any evidence proving that Mr. Wycoff was underpaid before the years at issue or what would have constituted reasonable compensation for those years. Even if Mr. Wycoff had been underpaid for years before the years at issue, the operating companies should have paid Mr. Wycoff directly and not Albion. Albion was not in existence before the years at issue and could not have provided services.

[*49] In summary, Mr. Wycoff's compensation was unreasonable and Mr. Nunes correctly adjusted Mr. Wycoff's compensation before calculating an arm's-length management fee. In calculating Mr. Wycoff's reasonable compensation, Mr. Nunes analyzed executive compensation of companies engaged in selling cleaning products and found that Mr. Wycoff's compensation was substantially more. Mr. Nunes provided a list of companies and excluded companies that were dissimilar either by product or revenue. We are not convinced that the operating companies' activities were more complex than the companies that Mr. Nunes relied on because the operating companies also sold cleaning products. Therefore, we find Mr. Nunes' conclusions regarding Mr. Wycoff's reasonable compensation reliable.

Petitioners contend that, even if Mr. Nunes computed Albion's expenses including Mr. Wycoff's compensation correctly, Mr. Nunes did not use comparable companies. However, according to the management contract, Albion was providing standard management services similar to those provided by the companies that Mr. Nunes used in his analysis. Mr. Nunes' report lists the comparable companies and describes the work each comparable company performed. Similarly to Albion, these companies provided management and consulting services to other companies. While the record is vague as to exactly

[*50] what Albion did and for whom, we accept Mr. Nunes' determination that Albion provided routine management services.

Petitioners further contend that Mr. Nunes' determination is not reliable because the cost markup was negative for 2002 and 2003. However, product sales fell during 2002 and 2003. Petitioners claim that this decline was due to the events of September 11, 2001. Petitioners also testified that a typical direct response marketing is usually profitable for only 18 months. Assuming without deciding that these statements are true, Albion should have expected to recognize losses in 2002 and 2003. Albion signed a long-term management contract. Petitioners' expert, Mr. Burns, stated that the contract was rational from an economic perspective and that if Albion oversaw a decline in sales, its compensation would be reduced. This ensured Albion was incentivized to grow sales and that Albion would share the risks with the product companies. Further, even after the management fees are adjusted to an arm's-length result for 2002 and 2003, the operating companies collectively recognized losses. Accordingly we find it rational that Mr. Nunes concluded that after substantial declines in sales Albion would recognize losses during 2002 and 2003.

Petitioners additionally contend that Mr. Nunes' reasonableness test, which averaged the three-year operating margin to determine whether his analysis was

[*51] consistent with an arm's-length result, was flawed because the test minimized the operating margin from 2001, petitioners' most successful year. The applicable regulations under section 482, however, provide that using multiyear data depends on the method being applied and the issue being addressed. In various circumstances multiyear data may be considered in determining an arm's-length result. See sec. 1.482-1(f)(2)(iii)(B), Income Tax Regs. These circumstances include situations where complete and accurate data is available for the taxable year under review, the taxpayer's industry is affected by business cycles, or the product being examined is affected by a life cycle. See id. Data from one or more years before or after the taxable year under review must ordinarily be considered for purposes of applying the CPM. Id.

Mr. Nunes applied the CPM, which generally requires the use of data from one or more years. Mr. Nunes had complete and accurate data available from the operating companies' and Albion's records. Additionally, Mr. Nunes determined and petitioners admitted that the operating companies were affected by macroeconomic recession and the products sold had a defined life cycle. Therefore, the use of multiyear data was appropriate.

**[*52]**       2.       Conclusion

Petitioners and their experts[31] have other criticisms of Mr. Nunes' report.

We do not find merit in these arguments and do not discuss them.  We conclude

that Mr. Nunes' determination was reasonable and produced the most reliable

measure of an arm's-length result under the facts and circumstances.  See sec.

1.482-1(c)(2), Income Tax Regs. (determining the best method depends on the

comparability of the transaction (or taxpayer) and the quality of the data).

Accordingly, petitioners' operating companies are entitled to the following

deductions for management fees:

| Company | 2001 | 2002 | 2003 |
|---------|------|------|------|
| Sirius | $1,346,000 | $939,000 | $266,000 |
| Restore 4 | 379,000 | 478,000 | 324,000 |
| Total | 1,725,000 | 1,417,000 | 590,000 |

III.   Section 6662(a) Penalties

Section 6662(a) and (b)(1) and (2) authorizes the Commissioner to impose a

20% penalty on an underpayment of tax that is attributable to (1) negligence or

disregard of rules or regulations or (2) any substantial understatement of income

tax.  Only one section 6662 accuracy-related penalty may be imposed with respect

---

[31]This includes the rebuttal report of Mr. Wertlieb.  However, we do not find Mr. Wertlieb's report persuasive, and therefore we do not discuss it.

[*53] to any given portion of an underpayment. New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 187 (2009), aff'd, 408 F. App'x 908 (6th Cir. 2010); sec. 1.6662-2(c), Income Tax Regs.

The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs. Disregard of rules or regulations "is 'careless' if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position" and "is 'reckless' if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." Id. subpara. (2); see also Neely v. Commissioner, 85 T.C. 934, 947 (1985). An understatement means the excess of the amount of the tax required to be shown on the return over the amount of the tax imposed which is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). An understatement is substantial in the case of an individual if the

[*54] amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

The accuracy-related penalty does not apply with respect to any portion of the underpayment for which the taxpayer shows that there was reasonable cause and that he or she acted in good faith.  Sec. 6664(c)(1).  The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances, including the experience, knowledge, and education of the taxpayer.  See sec. 1.6664-4(b)(1), Income Tax Regs.  "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer."  Id.  Reliance on the advice of a tax professional may, but does not necessarily, establish reasonable cause and good faith for the purpose of avoiding a section 6662(a) penalty.  United States v. Boyle, 469 U.S. 241, 251 (1985).  A taxpayer's reliance on a competent tax professional may establish reasonable cause and good faith when the taxpayer provides necessary and accurate information to the adviser and the taxpayer reasonably relies in good faith on the adviser's judgment.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

**[*55]** The Commissioner bears the burden of production with respect to the taxpayer's liability for the section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty. <u>See</u> sec. 7491(c); <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447. Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. <u>See</u> <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447.

Although the parties made concessions before the start of trial and on brief, and the Court allowed the operating companies to partially deduct the management fees paid to Albion, the computations under Rule 155 will establish that there is a substantial understatement of income tax. Respondent has, therefore, satisfied his burden of production to the extent that the accuracy-related penalty relates to a substantial understatement of income tax.

Petitioners contend that they had reasonable cause and acted in good faith because they reasonably relied on the advice of tax professionals with respect to setting the management fee. Petitioners did not contend that they had reasonable cause or acted in good faith with respect to the NOL. Therefore, with respect to

**[*56]** that portion of the underpayment, petitioners are liable for accuracy-related penalties under section 6662(a).

We next address whether petitioners reasonably relied on the advice of tax professionals with respect to setting the management fees paid to Albion. Petitioners sought the advice of Marshall & Stevens ESOP Capital Strategies Group, Barry Marlin, and Roland Attenborough to determine the proper management fees that the operating companies should pay Albion. To determine the management fees, petitioners' tax advisers met with Mr. Wycoff to understand the services Albion would provide to the operating companies and researched caselaw with respect to reasonable compensation. Petitioners were subsequently advised to set the rate of the management fees at 20% of each operating company's gross receipts.

Mr. Wycoff testified in great detail that companies using direct response marketing compensate differently from other companies; however, petitioners still relied on the advice of Marshall & Stevens, Mr. Marlin, and Mr. Attenborough to determine the management fee. Both Mr. Attenborough and Marshall & Stevens were experienced in forming ESOPs but were not experienced in determining an arm's-length management fee. Petitioners also knew that Mr. Attenborough was hired by Marshall & Stevens to complete the transaction and that Marshall &

[*57] Stevens had an economic interest in petitioners' going forward with the transaction. Mr. Attenborough had an obvious conflict of interest that petitioners and Mr. Marlin knew or should have known about. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98-99. Additionally, aside from the work that Mr. Marlin completed for petitioners, none of the advisers had experience with companies using direct response marketing. Mr. Marlin's law practice focused on international tax, and petitioners knew or should have known the planning at issue here did not involve any international tax issue. Petitioners did not consult an economist or any adviser with experience in determining an arm's-length management fee to calculate the management fees the operating companies paid Albion. Assuming that petitioners' claims are true regarding direct response marketing, a prudent business person in Mr. Wycoff's situation with similar experience, knowledge, and education would have sought the advice of an adviser with experience in direct response marketing and/or calculating a reasonable management fee. See sec. 1.6664-4(b)(1), Income Tax Regs. We are not convinced petitioners reasonably relied on independent advisers who were competent in calculating a reasonable management fee and/or executive compensation. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

**[\*58]** Neither did petitioners introduce any documentary evidence with respect

how the management fees were determined. Petitioners claim a document existed,

but they claimed they did not have it. See Wichita Terminal Elevator Co. v.

Commissioner, 6 T.C. 1158, 1165 (1946) (stating that a taxpayer's choosing not to

present evidence within his or her possession gives rise to a presumption that it

would have been unfavorable if it had). Petitioners' advisers testified only

vaguely regarding the determination of the management fees. The advisers

testified that the management fees were originally set at 20% of gross receipts

because, in caselaw they purportedly reviewed, unidentified courts had held that

percentage to be reasonable.[32] The advisers also met with Mr. Wycoff to

understand the services he provides, but the record does not indicate whether Mr.

Wycoff provided all necessary and accurate information to petitioners' advisers.

Petitioners presented no credible evidence that their advisers considered what

---

[32]On brief petitioners contend that the Court erred in excluding testimony
from Frederick Thomas, president of Marshall & Stevens. Petitioners contend that
Mr. Thomas could offer testimony of Marshall & Stevens' general business
practices to prove that an analysis of a reasonable management fee would have
been completed as part of the Marshall & Stevens transaction. Petitioners' tax
advisers testified that an analysis was completed. Although petitioners' tax
advisers' description of the analysis is vague, we conclude that the testimony of
Mr. Thomas would not have been helpful to the Court. He has no personal
knowledge of this particular transaction, and other advisers with personal
knowledge did testify.

[*59] comparable companies would pay for comparable services when calculating the management fees. Because the record is so vague as to how petitioners' advisers calculated the management fees, we cannot find that it was reasonable to rely on such an analysis.

Petitioners also knew that the Marshall & Stevens transaction was an aggressive tax planning program. Petitioners were warned that there were risks and were encouraged to seek independent counsel. Petitioners did not seek advice from independent counsel and from advisers with the requisite experience. In short, petitioners' reliance on their tax advisers, who were part of the promoter group, was not reasonable. Accordingly, we sustain accuracy-related penalties under section 6662(a).

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.